## Terence Martin *vs.* Evan S. Tyler, *et al.*

Opinion filed September 11th, 1894.

### Drainage Statute—Subject Expressed in Title.

A statute was entitled "An act to provide for establishing, constructing and maintaining drains in this state." Laws 1893, Ch. 55. It provided, *inter alia,* for the appointment of a drain commission, and vested in it the powers of the act. It provided for levying special assessments to pay for the cost of constructing drains. It provided for the issuance of county bonds to meet such expenses, and for the creation of a sinking fund to pay such bonds. *Held* not vulnerable to the constitutional objection that the bill embraced more than one subject, or that the subject was not expressed in the title.

### Drainage is not a Fiscal Affair of County.

Creating such drain commission, and vesting in it the powers of the act, did not violate § 172 of the constitution, which declares that the "fiscal affairs" of the county shall be transacted by a board of county commissioners.

### Private Property for Public Use—Compensation.

Under § 14, Art. 1, of the constitution of North Dakota, which reads: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation, other than municipal, until full compensation therefor be first made in money or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived,"—*held:* [That private property cannot be taken for public use for right-of-way without just compensation in money being first made to, or paid into court for, the owner, even though it is sought to be taken by a municipal corporation.

### Warrant for Damages is not Constitutional Payment.

Further, payment by an order drawn by the drain commissioners upon the drainage fund, which order the statute declares "shall be deemed a sufficient security for the amount thereof," was not such payment as the constitution required.

### Eminent Domain—Statute Void.

Further, that since the statute failed to provide compensation, as required by the constitution, the power of eminent domain could not be exercised under the statute; and, shorn of the provisions relating to the exercise of the right of eminent domain, the statute becomes so incomplete and ineffectual that we cannot presume that the legislature would have passed it as thus emasculated; hence the entire statute would fail.

**Compensation How Paid.**

> Further, that a provision in the statute that the warrant for damages, in case the owner was unknown, should be deposited with the county auditor for his use, was a violation of the constitutional provision that required compensation to be paid into court.

**Assessment By Jury Denied.**

> Further, that, when a municipal corporation sought to take plaintiff's property for public use, he was not entitled to have the compensation ascertained by a jury.

**Loan of Credit of the County to Corporations.**

> The drainage statute provides that the cost of the drain shall be apportioned by the drain commissioners between the cities and townships and property benefited by the drain, and provides, further, that such cost, so apportioned, shall be entered upon the tax list, and collected in one year; but the county commissioners may issue bonds of the county, running not more than 20 years, in sufficient amount to cover costs of drains in such county, the proceeds of the bonds to go direct to the drain fund, to pay the costs of such drains. In that event the assessment must be divided into as many parts as the bonds have years to run, and one part only be collected in each year, the collections so made to constitute a sinking fund to reimburse the county for the principal and interest paid on such bonds. *Held*, that such transaction constitutes a loan of the credit of the county to the corporations and individuals primarily and ultimately liable, and, as such, is a violation of § 185 of the constitution, and the law is to that extent void.

Appeal from District Court, Cass County; *McConnell*, J.

Three actions by Terence Martin—one against Evan S. Tyler and others, as drainage commissioners of Cass County, N. D.; one against George Nichols, as treasurer of such county, and another; and the other against H. L. Stafford and others, county commissioners of such county—for injunctions. From a judgment in each case overruling a demurrer to the answer, plaintiff appeals. Reversed.

*Miller & Resser* and *Newman, Spalding & Phelps*, for appellant.

The act Ch. 55, Laws 1893, is in conflict with § 61 of the constitution. *State* v. *Smith*, 35 Minn. 257; *Tingue* v. *Port Chester*, 101 N. Y. 294; *State* v. *Nomland*, 3 N. D. 427, 57 N. W. Rep. 85. It is also urged that the act conflicts with § § 170, 171, 172, 14, 185 and 176 of the state constitution.

*Robert M. Pollock*, (*Chas. A. Pollock*, of counsel,) for respondent.

The drainage act is not in conflict with § 61, constitution. The title is comprehensive. It provides for the establishing, constructing and maintaining drains etc., and the act creates the means and instrumentalities required for its own accomplishment. *State* v. *Woodmansee*, 1 N. D. 246; *State* v. *Haas*, 2 N. D. 202; *State* v. *Nomland*, 3 N. D. 427. Nor is the act in conflict with §§ 170, 171 and 172 of the constitution. The duties prescribed by the constitution as belonging to the board of county commissioners are not those which are required of the drain commissioners. The appointment of drain commissioners falls within the police power. *State* v. *Stewart*, 43 N. W. Rep. 947; *Dailey* v. *City of St. Paul*, 7 Minn. 311, (390;) *Bryant* v. *Robbins*, 35 N. W. Rep. 545. The act is not in conflict with § 14 constitution. This section does not require money to be paid. When property is taken by the state or by a municipal corporation by state authority it is not essential to the validity of the act for the exercise of the right of eminent domain that it should provide for making compensation before the actual appropriation. It is sufficient if provision is made by law by which the party can obtain compensation and that an impartial tribunal is provided for assessing it. Cooley Const. Law, 694; *Rogers* v. *Bradshaw*, 29 Johns 735; *Bloodgood* v. *The M. & H. R. Co.*, 18 Wend. 9; In Matter of Petition of U. S. etc., 95 N. Y. 237. If there is anything in the act from which the court can spell out an intention that just compensation shall be made and by whom it shall be made, and there is a mode given for ascertaining the amount, it must give a construction to the act that will sustain it. *Woodruff* v. *Town of Glendale*, 1 N. W. Rep. 581. None but owners can raise objection when property is taken by the state without just compensation. *Waterloo Woolen Co.* v. *Shanahan*, 128 N. Y. 345, 28 N. E. Rep. 358. It is the right of the public to the use that constitutes the public use. 22 Am. Dec. 690, note. Section 176 constitution relates to general taxes levied to defray the expenses of the government and does not prohibit the levy of assessments

for local improvements. *Hager* v. *Supervisors*, 47 Cal. 234; 1 Desty Taxation 5; *People* v. *Lynch*, 51 Cal. 20; *Dean* v. *Davis*, 51 Cal. 410; *Town of Macon* v. *Patty*, 34 Am. Rep. 453; *Williams* v. *Mayor*, 2 Mich. 260.

BARTHOLOMEW, . C. J. Theses cases have been submitted together. They are brought by the same plaintiff against different defendants, but to accomplish one purpose, and that purpose is to relieve plaintiff from the payment of a certain assessment laid upon his land, under the drainage law hereafter mentioned. The first action is against the drain commissioners of Cass County, and asks that they be perpetually enjoined from constructing a certain drain in said county, which they had caused to be established and partially constructed, and had assessed a certain per cent. of the cost of said drain against the property of plaintiff, which said commissioners declared to be benefitted by the construction of such drain. The second action is against the treasurer of said county and the holder of a certain warrant issued by the drain commissioners in payment of damages sustained by the construction of said drain. An injunction is sought perpetually restraining the payment of such warrant. The third case is against the county commissioners of said county, and seeks to enjoin them from issuing bonds of said county to pay for the construction of the drain in question and other similar drains, which it was alleged they were about to do. The answers in the several cases alleged, in substance, strict compliance with the provisions of Ch. 55, Laws 1893. A general demurrer to the answers was overruled, and the plaintiff appeals.

The case turns exclusively upon the question of the constitutionality of said Ch. 55. The act is a general drainage law, and is largely copied from the Michigan drainage laws. From a financial standpoint, it is one of the most important statutes ever enacted in the state. Thousands of dollars have already been expended under the law, and the drains now in process of construction and in contemplation throughout the state will, if completed, cost many thousands more. It is of importance to

the taxpayers that the validity or invalidity of the law be defi-
nitely settled and at once. Many objections are urged against the
law, and we deem it our duty to notice each of them. The statute
is too long for reproduction here, but a synopsis of it, with quota-
tions of portions, is absolutely necessary to an understanding of
the rulings that we are required to make.

The act is entitled "An act to provide for the establishing, con-
structing and maintaining drains in this state." The first part of
§ 1 reads: "Water courses, ditches and drains for the drainage
of swamps, marshes and other low lands may be established, con-
structed and maintained in the several counties and townships of
this state whenever the same shall be conducive to the public
health, convenience or welfare, under the provisions of the act."
The balance of the section defines a drain. Section 2 provides
for the appointment by the county commissioners of three drain
commissioners in each county, fixing their term of office at two
years, and providing for their removal and for filling vacancies.
Section 3 provides for their oath and official bond. Section 4
relates to drains in more than one county, and need not be
further noticed here. Section 5 provides for the application by
five or more freeholders, residing within proper limits, to the
drain commissioners, for the establishment of a drain, and for an
inspection of the ground by the said commissioners, and, if they
so order, a preliminary survey by a competent surveyor, and for
maps, with plans, specifications, and estimates, to be filed by said
surveyor with the county auditor. Section 6 make applicants
liable for costs when drain not necessary, but, if commissioners
determine drain to be necessary, they shall proceed to establish
the same. Section 7 reads as follows: "If, within twenty days
after such determination, all of the persons on whose lands the
proposed drain is to be placed shall not have executed a release
of right-of-way and all damages on account thereof, the board of
county drain commissioners shall appoint a time and place of
hearing upon the application, which shall not be less than ten
nor more than twenty days thereafter, and shall immediately

make application to the District Court of the county to ascertain the necessity for such drain and for taking private property for the use and benefit of the public for the purpose thereof, and the just compensation to be made therefor. Such application shall be made in writing, and shall describe the drain and the route and dimensions thereof, according to the survey, and shall state the facts which constitute the public necessity therefor and shall also state the time and place of hearing upon the application for such drain. The court to whom such application is made shall at once appoint a time for hearing and considering the same, and shall issue a citation to all persons whose lands are traversed by such drain to appear at the time appointed and be heard with respect to such application, if they desire to do so, which citation shall be annexed to a copy of the commissioners' application to the court and served in like manner with other process of the said court." Section 8 provides for personal service of citation upon owner or occupant of lands traversed by the drain, and service by posting in exceptional cases. Section 9 provides for the hearing in court upon the application, and requires the jury to determine—*First*, "whether such ditch will be conducive to the public health, convenience or welfare;" *second*, "whether the route thereof is practicable;" *third*, "amount of damage allowed to any person or persons or corporations." The section then proceeds: "And the court shall enter the proper judgment thereon. The damages allowed shall be irrespective of the benefits which the particular parcel of land will receive by the construction of such ditch, but such land shall be assessed for such benefits. The costs of all such proceedings shall be paid out of the fund raised for the purpose of constructing such ditch if the construction of the same be ordered. If no ditch is established such costs shall be paid by the county. Any party aggrieved may appeal from the judgment of the District Court as in civil cases, and upon such appeal costs may be awarded in the discretion of the court." Section 10 reads: "An order drawn by the board of county drain commissioners on the treasurer of the proper county for the

amount of any damages awarded from the location and construction of the said drain and tendered to the person entitled to such damages shall be deemed a sufficient security for the amount thereof. If the owner of any lands upon which any damages may be awarded be unknown, and such lands be not occupied, an order for the amount therefor shall be drawn, payable to the owner of the description of land upon which such damages were awarded, describing such lands by their legal subdivision in such order, which order shall be delivered to the county auditor to be held by such auditor, to be delivered to the owner of such lands when called for, or otherwise lawfully demanded, and the same shall thereby be deemed lawfully tendered to the owner of the lands; *provided*, the amount chargeable against such lands on account of the cost of construction of the drain, if less than the damages, shall apply in payment of the damages, and if equal to or more than such damages, the same shall apply to the full amount thereof, and for the purpose of accuracy in keeping the account the board of county drain commissioners shall furnish to the county treasurer, or other officer having the collection of the drain tax, a memorandum of the amount of the damages, and such treasurer or other officer shall credit the amount thereof upon the tax when he receives the tax roll, or so much thereof as may be equal to the tax, and such memorandum shall be a voucher for so much money as paid by such treasurer, and shall be allowed him on settlement." Section 11 reads: "Upon the release of the right-of-way the board of county drain commissioners shall make their order establishing the drain, and they shall give the same a name by which it shall be recorded and indexed; they shall also assess the per cent. of the costs of construction and maintenance of such drain which any township, city or village shall be liable to pay by reason of the benefit of such drain to the public health, or as to the means of improving any public highway, and they shall assess the benefits to accrue to the roadbed of any railroad or turnpike by reason of the construction of such drain, and they shall assess proportionately

the benefits to accrue, either directly or indirectly, to any piece or parcel of land by reason of the construction of such drain, whether such lands be immediately drained by the said ditch, or whether they can be drained only after the construction of other and connecting ditches, but such assessment shall be subject to review by the commissioners upon the request of parties in interest, at or before the time of letting the contracts for the construction of such drain." Section 12 provides that commissioners shall make full returns, after drain is established, to county auditor; and the auditor shall make and preserve a record thereof. Section 13 provides for letting contracts for the construction of the drain. Section 14 provides for a hearing upon the rate of assessments and the letting of the contracts. Section 15 reads: "Upon the letting of such contracts the commissioners shall make a computation of the cost of such drain, which shall include all the expense of locating and establishing the same, including the drain commissioners' fees, cost of survey, and fees and expenses of the special commissioners, advertising and all other expenses, the amount of damages awarded by the special commissioners and the amount of contracts, and in case contracts shall not have been let for the construction of the whole of such drain, the board of county drain commissioners shall estimate the cost of the unlet portion, predicating their estimate so far as may be upon the cost of those portions that have been let. They shall add the whole in a gross sum, and shall add thereto ten per cent. to cover contingent expenses, delinquencies and any extra charges that may accrue, and the sum thus ascertained shall be the cost of construction of such drain." Section 16 reads: "The board of county drain commissioners shall apportion to each township, city or village benefitted by such drain from sanitary or other considerations, the amount chargeable against such municipality on account of the construction of such drain, according to the per cent. which by Section 12 [11] of this act, they are required to fix and determine, and they shall apportion the balance of the cost of

construction upon the lands to be benefited by such drain, and assess the amount to be paid on each description of land in proportion to the benefits it receives from such drain. They shall make a list showing such apportionment and assessment and shall serve a copy thereof upon the clerk of each township or upon the clerk of any city or village against which any sum is assessable or in which any lands are situated that are assessable under such apportionment, and the amount assessable upon any such township, city or village shall be levied as part of the township tax for the year, and the amount assessable upon any description of land shall be assessed and levied against such land by the assessing officer as drain taxes, naming the particular drain for the construction of which the same is assessed. Within two days after the service of such notice as aforesaid, the board of county drain commissioners shall appoint a time and place of such apportionment and assessment and shall give notice thereof by a notice which with such apportionment list, must be published once in each of two consecutive weeks in a newspaper of general circulation printed and published in said county, and on the day mentioned in such notice such commissioners shall meet and hear all complaints on such apportionment and assessment and correct and confirm the same, and the said list shall thereupon be filed in the office of the county auditor in which such lands, cities, towns and townships are located, and shall constitute the assessment roll of such drain. Said commissioners may adjourn from day to day and if a quorum be not present less than a quorum may adjourn each meeting." Section 17 reads: "In case of drains established by the board of county drain commissioners, the drain taxes, when collected, and all moneys received on account of state lands shall be returned to the county treasurer, and all moneys so collected or returned shall be credited to the drain fund to which they belong, and such county treasurer shall be the treasurer of such drain fund. Orders drawn by the drain commissioners in payment for the construction of any drain shall be payable from the proper drain fund and shall be receivable for

the taxes levied for the construction of such drain by the county treasurer or by the state treasurer, as the case may be." Upon that portion of the statute from Sections 18 to 37, inclusive, no point is raised. Section 38 reads: "The board of county commissioners of each county wherein such ditch or ditches are proposed to be located and established are hereby authorized to issue the bonds of said county, in such sums as may be necessary for the purpose of defraying the expenses incurred or to be incurred in locating, constructing and establishing the same, said word 'expenses' to be construed to mean and cover every item of cost of said ditch, from its inception to its completion, and the said counties to be reimbursed as hereinbefore provided. Said bonds shall bear interest at a rate not exceeding 7 per cent. and shall be payable not exceeding twenty years from the date thereof, and the said commissioners shall provide a sinking fund for the payment of said bonds at maturity and for the payment of the annual interest on the same. The bonds issued under the provisions of this act shall be signed by the chairman of the board of county commissioners of said county, and countersigned by the county auditor, who shall keep a record of the bonds issued under the provisions of this act. The said board shall have the power to negotiate said bonds as they shall deem best for the interest of said county; provided, that they shall not negotiate the same at less than par value. All such bonds shall contain a recital that the same are issued in accordance with the provisions and pursuant to the authority of this act. Whenever such bonds shall be issued the tax and assessment hereinbefore provided for shall not be collected all in one year, but shall be divided into as many parts as such bonds have years to run, and one of such parts shall be extended upon the tax roll by the county auditor against the proper parcel of land in each and every year and collected in such year, and such fund shall constitute the sinking fund provided by this section, and the board of county commissioners shall in each year, at the time of levying the taxes, levy a tax sufficient to pay the annual interest on said

bonds." Section 39 provides for the repeal of certain specified acts and all other acts inconsistent with the provisions of this act.

In passing upon the constitutionality of any statute, there are certain elementary principles of which courts must ever be mindful. These principles render that certain which otherwise might be uncertain; that simple which otherwise might be complex; that safe which otherwise might be dangerous. We must remember that legislative power is primarily plenary, and that constitutions are not grants of, but restrictions upon, that power. Hence he who would challenge a legislative enactment must be able to specify the particular constitutional provision that deprived the legislature of the power to pass the enactment. We must remember that it is the duty of courts to reconcile statutes with the constitution when that can be done without doing violence of either, and in all cases of doubt, the doubt must be resolved in favor of the constitutionality of the statute. Thus much deference the judicial department of government owes to the legislative. But we must remember, also, that the constitution is the shield which the state, in its sovereign capacity, has provided for the protection of private rights. This protection is necessary. Every period in civilized history, however remote or however recent, but emphasizes the fact that unrestrained legislation is inimical to individual rights. Having provided the shield, the state has created its courts, and charged them with the special duty of seeing that every legislative blow improperly aimed at the life, liberty, happiness, or property of the individual falls harmlessly upon that shield. The court that fails in this duty fails in the purposes of its creation, and should be barred from further participation in governmental affairs. With these general guides, let us examine this statute.

It is first urged against this statute that it violates Section 61 of the constitution of North Dakota, which reads: "No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so

expressed." It is claimed that this provision is violated (1) in the creation of a special drainage commission, and vesting in it the powers of the act; (2) in the levying of special assessments to pay the costs of constructing drains; (3) in providing for the issuing of bonds and a sinking fund to pay the same; and (4) in the repealing provisions of Section 39. This constitutional provision has been passed upon by this court in *State* v. *Woodmansee*, 1 N. D. 246, 46 N. W. 970; *State* v. *Haas*, 2 N. D., 202, 50 N. W. 254; *State* v. *Nomland*, 3 N. D., 57 N. W. 85. We do not wish at this time to add anything to what was said in those cases upon this point, but, applying the principles as there announced, it is clear to us that this objection cannot be sustained. The title to the act in question is very broad: "An act to provide for the establishing, constructing and maintaining drains in this state." It covers the entire subject. Whatever means and instrumentalities are necessary or usual and proper for effectuating the purposes of the act may be provided in the act. The objections go only to the means and instrumentalities. Upon the provision relating to the issuance of bonds, counsel cite us to the cases of *Mayor* v. *Ray*, 19 Wall. 468; *Claiborne Co.* v. *Brooks*, 111 U. S. 400, 4 Sup. Ct. 489; and *Merrill* v. *Monticello*, 138 U. S. 673, 11 Sup. Ct. 441. These cases hold that authority to a municipality to make improvements or incur indebtedness does not carry with it, by implication, the power to issue negotiable paper. This proposition may be granted. The question here is different. It is not what power passes by implication, but what power may be expressly granted under a title authorizing internal improvements. We think authority to pay for such improvements in some manner other than the ordinary taxation, particularly when, as in this case, the limit of ordinary taxation might be totally inadequate to meet the expense, is entirely germane to the title, and the issuance of bonds is perhaps the most common means known to the law for meeting such expenses. It is claimed that the repeals contained in the thirty-ninth section of the act violate

this constitutional provision, under the rulings in *State* v. *Smith*, 35 Minn. 257, 28 N. W. 241, and *Tingue* v. *Village of Port Chester*, 101 N. Y. 294, 4 N. E. 625. The cases are not applicable. In the Minnesota case the act was entitled "An act to amend Chapter 1 of the General Laws of 1878, to provide for the assessment and collection of taxes, being Chapter 11, General Statutes of 1878." This title was restrictive, and, by its terms, confined to an amendment of Chapter 1 of the General Laws of 1878; yet the legislature, under that title, proceeded to repeal another statute which the court held might coexist with the amendment. The principle of the case from New York is very similar. But here we have a new enactment,—a statute complete in itself, and requiring in its operation no aid from other provisions. Being the latest expression of the legislative will, it might, by implication, repeal all inconsistent statutes. But repeals by implication are not favored in law; hence it was highly proper that inconsistent statutes be repealed in express terms. It was the proper means of placing the new enactment in successful operation.

The second objection urged against the statute is that it violates Section 172 of the constitution, which declares that the fiscal affairs of the country shall be transacted by a board of county commissioners. If we carefully consider Sections 170, 171, and 172 of our state constitution, we are forced to the conclusion that the words "fiscal concerns," "fiscal affairs," and "affairs," and "government" are used interchangeably. Section 170 authorizes the legislature to provide by general law for township organizations under which any county may organize; and, when such organization is adopted in any county, "so much of this constitution as provides for the management of the 'fiscal concerns' of said county by the board of county commissioners may be dispensed with by a majority vote of the people voting at any general election, and the 'affairs' of said county may be transacted by the chairman of the several township boards of said county." But it cannot be claimed for a moment that the duties of the township chairman, when in charge of the "affairs" of the county,

would differ in any manner from the duties of the commissioners when in charge of the "fiscal concerns" of the county. Section 171 reads: "In any county that shall have adopted a system of government by the chairmen of the several township boards, the question of continuing the same may be submitted to the electors of such county at a general election in such a manner as may be provided by law, and if a majority of all the votes cast upon such question shall be against said system of government, then such system shall cease in said county and the affairs of said county then be transacted by a board of county commissioners as is now provided by the laws of the Territory of Dakota." Here the conduct of the county business by the township chairmen is called a "system of government," and it is provided in what manner this system shall cease; "and the affairs of the county shall then be transacted by a board of county commissioners as is now provided by the laws of the Territory of Dakota." But the board of county commissioners provided for by the territorial laws was identical with the board provided for by the next section of the constitution, and the duties of that board were specifically fixed by the statute Section 592, Compiled Laws. This statute is continued in force by Section 2 of schedule to constitution. These duties are such as are common to all the counties in the state; such as they ordinarily and usually perform as a part of their perminent functions. Section 172 of the constitution then provides that, until the change is made to the township system, the "fiscal affairs" of the county shall be transacted by a board of county commissioners, consisting of not less than three or more than five members. We fully agree with the learned counsel for appellant that the words "fiscal affairs," as here used are not limited to matters pertaining solely to public revenue, as they doubtless are in some connections. They mean rather the business transactions of the county,—the performance of such duties as the law has defined and placed upon county commissioners, or such as uniformly pertain to that office. In *Bryant* v. *Robbins*, 70 Wis. 258, 35 N. W. 545, Chief Justice Cole for the full

court, said: "It may admit of doubt, as argued by the counsel of the appellants, whether the power to construct drains, etc., given to town and county officers under the general law, is, strictly speaking, a part of the 'system of government' belonging to those politicial corporations, within the meaning of the constitution. It is rather a special authority, conferred for a special purpose, calculated to promote the public health and welfare. The powers and duties of county and town officers are those which they ordinarily and usually exercise as a part of the regular and permanent administration of the town and county governments. It is a significant fact in this discussion that no drainage law was enacted for several years after the adoption of the constitution, nor was any such power as is now conferred given to town and county officers to execute such work. There is therefore strong reason for saying that the power to construct drains is in no proper sense a part of the usual powers belonging to town and county goverments, but is a special authority, given for a particular purpose, and which may be conferred upon any persons or body upon which the legislature may see fit to confer it." Surely, this language is applicable to this case. It will not be contended for a moment that, under their general powers, the county commissioners could engage in the work of constructing drains; that they could for that purpose exercise the power of eminent domain,—assess benefits and institute proceedings to ascertain damages. This was a special purpose, and its accomplishment required special legislative authority, which might be placed where the legislature saw proper. See, also, *Sheboygan Co.* v. *Parker,* 3 Wall. 93.

Section 14, Art. 1, of our constitution reads as follows: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation, other than municipal, until full compensation therefor be first made in money or ascertained and paid into court for the owner, irrespective of any benefit from any

improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived." It is very forcibly pressed upon us by learned counsel that the drainage act violates this provision, in the following particulars: (*a*) Because Section 10 of the act provides that damages may be paid by warrants drawn by the drain commissioners upon the drainage fund, while there might be no money in that fund until the drain was established, the benefits assessed, the tax levied and collected; hence the property would be taken without just compensation being first made, and without payment in money. (*b*) Said Section 10 also provides that such warrants may be delivered to the county auditor for unknown owners, while the constitution requires the compensation to be made to or paid into court for the owner. (*c*) Because the compensation is not ascertained by a jury. Under Section 9, the jury determines the "amount of damages allowed to any person," but the damages allowed shall be "irrespective of benefits." The benefits are assessed by drain commissioners. The "just compensation" is the amount of damage, if any, remaining after benefits have been deducted. This balance the jury is not permitted to find. Section 14, of the constitution of North Dakota was copied literally from Section 14, Art. 1, of the constitution of California adopted in 1879. The California constitution of 1849 simply reads: "Nor shall private property be taken for public use without just compensation." Section 8, Art. 1. Under the old constitution, it was held that taking private property for public use without making compensation at the time, or, in case of a municipal corporation, providing a fund certain from which payment should be made upon the termination of condemnation proceedings, was a violation of the constitutional provision (*McCann* v. *Sierra Co.*, 7 Cal. 121; *Colton* v. *Rossi*, 9 Cal. 595; *Johnson* v. *Alameda Co.*, 14 Cal. 106); and that property was "taken," within the meaning of the provision, when it passed from the possession and control of the owner, and not when the title ultimately passed to the corporation (*Davis* v. *Railroad Co.*, 47 Cal. 517, overruling *Fox* v. *Railroad Co.*, 31 Cal.

538; and *Sanborn* v. *Belden*, 51 Cal. 266). In this latter case it is purposely left undecided whether or not precedent payment or tender of payment must not be made even when the property is taken by a municipal corporation. These decisions were all rendered prior to the adoption of the constitution of 1879, and and enable us the better to understand what was sought to be accomplished by the new provisions upon that subject introduced into that instrument. Section 14, of our constitution divides naturally into two parts. The first reads: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner." As originally reported by the judiciary committee of the California constitutional convention of 1879, the section contained nothing more. See Constitutional Debates, 346. At that time the provision as thus introduced existed substantially in the constitutions of a large number of the states. See note on pages 659, 697, Cooley, Const. Lim. (5th Ed). The term "just compensation" had already been defined in California to be that compensation which was based upon damages sustained and benefits received. *Railroad Co.* v. *Caldwell*, 31 Cal. 368; *Railroad Co* v. *Armstrong*, 46 Cal. 85; and to the same purport are *Nichols* v. *City of Bridgeport*, 23 Conn. 189; *Trinity College* v. *City of Hartford*, 32 Conn. 452; *State* v. *Graves*, 19 Md. 351; *Page* v. *Railway Co.*, 70 Ill. 324; *Harlow* v. *Railroad Co.*, 41 Mich. 336, 2 N. W. 48. These cases make it reasonably certain that the words "just compensation," as used in the California constitution, and later in our own constitution, mean the excess of damages sustained over benefits received. For cases that reject this defination of "just compensation," see *Carpenter* v. *Jennings*, 77 Ill. 250; *Isom* v. *Railroad Co.*, 36 Miss. 300; *Penrice* v. *Wallis*, 37 Miss. 172; *Robbins* v. *Railroad Co.*, 6 Wis. 636.

Under constitutional provisions declaring that private property shall not be taken for public use without just compensation, and silent as to the time of payment, it has generally, if not universally, been held, when property was thus taken by a private corporation, that payment must precede the taking; but, where

the property was taken directly by the state or a municipality of the state, it has generally been held a sufficient compliance with the provision if the compensation was definitely ascertained, and made a charge upon a municipal fund for which the credit of the municipality was pledged. *Rogers* v. *Bradshaw*, 20 Johns. 744; *Bloodgood* v. *Railroad Co.*, 18 Wend. 9; *Chapman* v. *Gates*, 54 N. Y. 132; *Brock* v. *Hishen*, 40 Wis. 674; *Long* v. *Fuller*, 68 Pa. St. 170; *Orr* v. *Quimby*, 54 N. H. 590. The same ruling has been made in Minnesota and Michigan, where the constitution requires the compensation to be first paid or secured. See *State* v. *Messenger*, 27 Minn. 119, 6 N. W. 457; *State* v. *Bruggerman*, 31 Minn. 493, 18 N. W. 454; *People* v. *Michigan S. R. Co.*, 3 Mich. 496. But we are cited to no case (and, if such a case existed, we are sure the tireless industry of counsel would have found it) arising in those states having the constitutional provision as thus reported to the constitutional convention of California, and as found in the first part of Section 14 of the constitution of this state, where it has been held that the state or any municipality acting for the state could take private property for public use unless just compensation therefore accompanied or preceded the taking. The point does not seem to have arisen. Indeed, the language is so plain and express that judicial construction would be superfluous. It has sometimes been asserted broadly that private property could not be so taken, as in the Mississippi cases *supra*. In New Jersey, where practically the same provision is found, but limited to individuals or private corporations, the chancellor, in discussing the meaning of the word "first," in *Redman* v. *Railroad Co.*, 33 N. J. Eq. 165, said: "Its meaning, to my mind, is perfectly obvious; indeed, it is its own expositor. When this is the case, reasoning and illustration have no office. The provision under consideration plainly ordains that compensation shall precede appropriation; and, if the legislature in this enactment have not observed this direction, they have transcended their power." The fact that the provision is, in this state, unlimited in its application, cannot change the clear meaning of the words used. It becomes

clear, then, that, under the provision as originally reported to the
California constitutional convention, the owner of private prop-
erty, when the same was taken for public use, could in no case
damand more than "just compensation,"—*i. e.* such compensation
as represented the excess of damages sustained over benefits
received; but in all cases such just compensation should be paid to
or paid into court for, the owner, before the property could be
taken.

We may now proceed to analize the amendment which was
offered and adopted, and which constitutes the balance of
Section 14 of the constitution of this state, and reads: "And
no right-of-way shall be appropriated to the use of any
corporation, other than municipal, until full compensation there-
for be first made in money or ascertained and paid into court for
the owner, irrespective of any benefit from any improvement pro-
posed by such corporation, which compensation shall be ascer-
tained by a jury, unless a jury be waived." We notice that this
provision relates to the appropriation of right-of-way. If private
property be taken for any other public use, it falls within the first
provision in this section. This right-of-way must be appropri-
ated to the use of a corporation "other than municipal." If a
municipal corporation appropriate a right-of-way, it still falls
within the first provision. For this right-of-way, thus appropri-
ated by a corporation other than municipal, full compensation
must be made in money; that is, a compensation "irrespective of
any benefits." Strictly speaking, full compensation is required in
every case; but, except in cases of the appropriation of a right-of-
way by a corporation other than municipal, this full compensation
may be paid in benefits received to the extent of such benefits,
leaving the balance only, or the just compensation, to be other-
wise paid. From the fact that the constitution directs that, for
right-of-way appropriated to the use of a private corporation, full
compensation shall be paid in money, learned counsel argue that,
for right-of-way appropriated to the use of a municipal corpor-
ation, just compensation need not be paid in money, but may be

paid in warrants; and it is claimed that this is a recognition of the fact that municipalities habitually pay by warrant. To this we cannot assent. The word "money" is used to exclude benefits. Just compensation, when ascertained, must always be paid in money. Money is the measure of compensation. Compensation represents the money value of property taken or damaged. Just compensation can be made in no other medium. Dill. Mun. Corp. (4th Ed.) § 612; Cooley, Const. Lim. 963; *Butler* v. *Commissioners*, 39 N. J. Law, 665; *Com.* v. *Peters*, 2 Mass. 125; *Railroad Co.* v. *Halstead*, 7 W. Va. 301; *Vanhorne's Lessees* v. *Dorrance*, 2 Dall. (Pa.) 304; Mills. Em. Dom. § 135. Further, the statute does not treat the warrant as payment. It says the order "shall be deemed a sufficient security for the amount thereof." Security negatives payment. It is that which is given to insure payment at some future time. The manner in which this provision found its way into our statutes is entirely clear. It was the result of a literal copy of the Michigan drainage act. But in Michigan the constitution requires the compensation to be paid or secured. Our constitution requires payment. Security is wholly inadmissible. It is clear to us that there is no such provision for compensation contained in said Chapter 55, as our constitution imperatively requires; hence the act will not warrant the exercise of the power of eminent domain. *Thacher* v. *Dartmouth Bridge*, 18 Pick. 501; *Boston & L. R. Co.* v. *Salem & L. R. Co.*, 2 Gray, 1-37; *Petition of Mount Washington Road*, 35 N. H. 134; *Eastman* v. *Manufacturing Co.*, 44 N. H. 143-160; *Weaver* v. *Boom Co.*, 30 Minn. 477, 16 N. W. 269; *Watkins* v. *Walker Co.*, 18 Tex. 586; *Foster* v. *Bank*, 57 Vt. 128.

We here meet another question that is not without difficulty in this case. It is this: Granting that the power of eminent domain cannot be exercised under this statute, and that the provisions upon that subject are unconstitutional and void, must the whole statute for that reason fail? If there were no attempt in this statute to provide for compensation, then the law would conclude that it was not the legislative intent to exercise the power of eminent domain, but that the right-of-way was to be acquired by

private contract. Mills, Em. Dom. § 128, and cases cited. But we cannot so treat this statute. There was a clearly expressed intent to provide for compensation, but therein the law was unconstitutional; and whether or not the law can stand with such portions eliminated depends, nakedly stated, upon whether or not there remains a complete enactment capable of enforcement, and one that it may reasonable be presumed the legislature would have passed shorn of its unconstitutional features: It is our duty to sustain statutes in their entirety when possible, and to that end we must indulge all reasonable presumptions in favor of their constitutionality. But, when a statute has been once emasculated, these presumptions no longer obtain in support of the remainder. It should then be manifestly clear that the remaining portion can stand by itself, and that the legislature did not intend that such portion should be controlled and modified in its construction and effect by the rejected part. See note to page 213, Cooley, Const. Lim. (5th Ed.). In many cases where provisions for compensation in statutes authorizing the exercise of the power of eminent domain have been held unconstitutional, the entire statute has been treated as void. *Eastman* v. *Manufacturing Co., supra; People* v. *Leow*, 39 Hun. 490; *Bloodgood* v. *Railroad Co.*, 18 Wend. 9; *Thacher* v. *Dartmouth Bridge*, 18 Pick. 501; *Watkins* v. *Walker Co.*, 18 Tex. 585; *Weaver* v. *Boom Co.*, 30 Minn. 477, 16 N. W. 269. While this holding is not entirely uniform (See Lewis, Em. Dom. § 452), and while, perhaps, a uniform rule would not be desirable in all cases where the exercise of this power of eminent domain fails, yet we are convinced that in this case the entire statute should be held void. When we eliminate from the statute the power of eminent domain, we take out, bodily, Sections 7, 8 and 9, and various clauses in other sections. We have left only a weak, inefficient statute, incapable of enforcement. Enforcement carries with it the idea of execution without consent. That which is done by consent, and can only be done by consent, is not enforced. With the right to exercise the power of eminent domain gone, it might be possible to construct a drain under the

statute if every land owner through or along whose land it was sought to establish the drain would voluntarily release the right-of-way and damages; but it is inconceivable that the legislature would have placed upon the statute book an important and far-reaching statute dependent for its effectiveness upon the whim of any one man whose land might be needed for right-of-way. We cannot in support of a fragmentary statute, indulge a presumption so unreasonable, and must therefore hold the entire statute nugatory. The provision which requires the warrant for damages, where the owner is unknown, to be deposited with the county auditor, is a clear violation of the provision of the constitution which requires the compensation to be made to or paid into court for the owner. It need only be stated to be understood, and renders the statute, to that extent at least, void. *National Docks, etc., Ry. Co.* v. *United New Jersey Railroad & Canal Co.* (N. J. Ch.) 28 Atl. 673.

We do not think that the manner in which compensation is ascertained under the statute is any violation of Section 14 of the constitution. It is true that the ascertainment of just compensation is a judicial proceeding, but a party has no inherent right to have such compensation fixed by jury. This has been repeatedly held. *Kohl* v. *U. S.,* 91 U. S. 375; *U. S.* v. *Jones,* 109 U. S. 513, 3 Sup. Ct. 346; *Manufacturing Co.* v. *Garland,* 25 Fed. 521; *Ames* v. *Railroad Co.,* 21 Minn. 241; *People* v. *Smith,* 21 N. Y. 595. The original provision in said Section 14 of the constitution, as reported to the California convention, contained no reference to a jury. That was added in an amendment which created an exceptional class of cases, and, in the connection in which it was placed, we think it applied only to such exceptional cases. The entire section speaks of two different characters of compensation. First it speaks of "just compensation" as applied generally. It then creates the exceptional class, and for that class it demands "full compensation," and adds "which compensation shall be ascertained by a jury." Ordinarily, these words would not include both characters of compensation, but would include that

last under discussion, to-wit, full compensation, and such we think was the intention. If we are correct in this, it follows that under our constitution, whenever private property is appropriated for right-of-way by a corporation other than municipal, the compensation must be ascertained by a jury, while in all other cases a jury is unnecessary. But it would not follow that a provision for a jury in such other cases would be unconstitutional. The legislature may not curtail the rights of the citizen below the limit fixed by the constitution, but they may properly expand such rights. We see no violation of any constitutional provision, and no possibility of injustice to the property owner, in having the total damages, in cases of this character, ascertained by a jury, and having the benefits assessed and the balance struck by the other tribunal, to-wit, the drain commissioners. This principle was involved and sustained in *City of Cleveland* v. *Wick*, 18 Ohio St. 303.

We ought to remark in this connection that the right of plaintiff to raise the questions we have been discussing under Section 14 of the constitution has not been denied. The questions have been fully discussed on their merits by both parties, and plaintiff's right to raise the same has thus been conceded, and, being conceded, a ruling upon the questions became necessary to a decision of the case.

Section 38 of the statute does not appear in any drainage law that we have examined. We believe it to be new in this connection. It provides for the issuance and sale of county bonds, running for a series of years, and drawing interest at a rate not to exceed 7 per cent. The proceeds of these bonds are to be passed to the drainage fund, and used to meet the expenses of establishing and constructing drains. Provision is made by which the county is to be repaid, certainly to the amount of the principal, and, as we construe it, the interest also, by the municipalities and persons upon whom special assessments are laid under the law. It is urged upon us that this violates Section 185 of our state constitution, which prohibits any county from loaning or giving its

credit or making donations to or in aid of any individual asssociation or corporation except for necessary support of the poor. An analysis of other provisions of this statute shows that the special assessments upon the corporations and persons benefited, and which assessments must equal the entire estimated cost of the drain, with 10 per cent. added, to cover contingencies, must be levied and collected in one year. This might often prove a hardship, and, to avoid it, Section 38 was enacted. When bonds are issued by the county under that section, then the special assessment, which otherwise must be paid in one year, must be divided into as many parts as the bonds have years to run, and only one part is to be extended upon the tax roll and collected in any one year; and the sums thus collected constitute the sinking fund for the payment of the bonds at maturity, and of the annual interest on the same. By this means the payment, which must otherwise be made in one year, may be extended over 20 years. This indulgence to the corporations and persons benefited and specially assessed is obtained by means of the credit of the county. Its bonds are issued under the drainage act, and must so state on their face. The proceeds of the bonds go, not into the control of the county commissioners, but at once into the drainage fund, controlled exclusively by the drain commissioners. The county has its compensation in the provisions which enable it to collect the special assessments out of which to reimburse itself. But, however much or however little may be realized from the special assessments, the county, as such, must pay the bonds at maturity, as well as the annual interest thereon. No refinement of construction or technical rule of law can make this transaction less than a loan of the credit of the county to the parties primarily liable for the cost of the drain. Judge Cooley, speaking for the court in *People* v. *State Treasurer*, 23 Mich. 499, said; "The legislature can neither compel the taxation of municipalities in aid of railroads companies, nor empower them, in order to give such aid, to tax themselves, or to contract indebtedness which must be paid by taxation,"—citing *People* v. *Township Board of*

*Salem*, 20 Mich. 452. It is true that the Supreme Court of the United States in *Township of Pine Grove* v. *Talcott*, 19 Wall. 666, —a case which went up from the western district of Michigan,— refused to follow the Michigan court; but it was on the ground that the Michigan prohibition against loaning credit extended to the state only, and did not in terms include counties and townships. See, also, upon this point, *Webb* v. *Lafayette Co.*, 67 Mo. 353; *Thomas* v. *City of Port Huron*, 27 Mich. 320.

But it is urged that draining swamp and overflowed lands, when it will conduce to the health and welfare of the community and benefit the highways, is a public service, for which it was within the power of the legislature to make the county originally liable, and that power must include the power to make the county temporarily liable. The conclusion is not warranted under our constitution. It was within the power of the legislature to designate the localities that would be benefited by the drains, and that should bear the burdens thereof. *Stone* v. *Charlestown*, 114 Mass. 214; *Com.* v. *Plaisted*, 148 Mass. 375, 19 N. E. 224; *King* v. *City of Portland*, 2 Or. 146; *Williams* v. *Commack*, 27 Miss. 209. This determination of the legislature is, of course, final. In this case, by placing the benefits and burdens elsewhere, the legislature has declared that the county, *quoad hoc*, is not benefited. The whole burden is thrown upon other corporations and persons. The obligation rests entirely upon them, and they are never relieved. All the county can do is to obtain for them an extension of the time of payment by the loan of its credit. This the constitution prohibits; and the plaintiff, being a property owner and taxpayer within the County of Cass, is entitled to a writ against the said county commissioners perpetually enjoining them from the issuance of bonds of the county under the provisions of said Section 38 of said drainage act.

One more objection is urged against the statute. It is claimed that it violates the provisions requiring uniformity in taxation, found in Section 176 of the constitution. It is first claimed that the provision for special assessment is void. We think not.

Section 130 of the constitution directs the legislature to provide by law for the organization of municipal corporations, restricting their powers as to levying taxes, assessments, etc. It is said this does not apply to counties. It is immaterial. It does not authorize a grant of power to make assessments. It simply recognizes the existence of such power, and directs its restriction. The rule "*expressio unius,*" etc., does not apply. We understand counsel to admit—granting the existence of the power to levy special assessments—that such assessments differ radically in their nature and purpose from ordinary taxation, and that the rule which requires uniformity in taxation has no application whatever to special assessments. This has now become so elementary that citations are unnecessary. The real difficulty lies deeper. It is claimed that under this law the special assessments must equal the total cost of establishing and constructing the drain, without regard to the benefits received; that, while the assessments must be in proportion to the benefits received, as between the parties benefited, yet the assessment in each case may exceed the individual benefit, and in the aggregate exceed the total benefits. It is then claimed that special assesments are based upon, and must be measured by, benefits received; and that, when a special assessment exceeds the benefits received, it ceases as to such excess to be a special assessment, but is to that extent taxation proper; and that, under the statute, such taxation is laid upon particular property belonging to particular taxpayers, while, under the rule of uniformity required by the constitution, it should be paid upon all property within the taxing district. The constitutional question thus raised is of much importance, and its solution is not without difficulty. It is not entirely clear from the reading of the statute that it was the legislative purpose to permit special assessments to exceed actual benefits; and, as we hold the entire statute unconstitutional upon other grounds, we decline at this time to pass upon this question; but, in view of the possibilities of future legislation, it may not be improper for us to say that courts seem to view with disfavor any attempt on the

part of the legislature to charge property with special assessments for improvements in excess of the actual benefits received by such property by reason of such improvements. See *Tide-Water Co.* v. *Coster*, 18 N. J. Eq. 518; *Creighton* v. *Manson*, 27 Cal. 614; *Crawford* v. *People*, 82 Ill. 557; *Nichols* v. *Bridgeport*, 23 Conn. 189; *Stephani* v. *Catholic Bishop*, 2 Ill. App. 249; *Chamberlain* v. *Cleveland*, 34 Ohio St. 551; *State* v. *District Court*, 29 Minn. 62, 11 N. W. 133; *State* v. *Seymour*, 35 N. J. Law, 49; *Dyar* v. *Farmington Village Corporation*, 70 Me. 515. But, *contra*, see *Keith* v. *Boston*, 120 Mass. 108; Kingman, Petitioner, 153 Mass. 566, 27 N. E. 778; *Spencer* v. *Merchant*, 100 N. Y. 585, 3 N. E. 682, affirmed in 125 U. S. 345, 8 Sup. Ct. 921.

In closing, we wish to acknowledge our obligation not only to the able counsel in these cases, but also in the case following and ruled by this, *infra*, and to W. J. Kneeshaw, Esq., who filed a brief in support of the law in behalf of Pembina County.

The District Court will reverse the judgment in each case, and sustain plaintiff's demurrer to the answer, and enter judgment as prayed for in the complaint.

Reversed.   All concur.